UNITED STATES DISTRICT COURT  ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
NALIA MILIEN,

                        Plaintiff,            MEMORANDUM AND ORDER

      -against-                              10-CV-2447 (JG)

MICHAEL J. ASTRUE, Commissioner
of Social Security,

                        Defendant.
----------------------------------------------------------------x
A P P E A R A N C E S:

    CHRISTOPHER JAMES BOWES
        54 Cobblestone Drive
        Shoreham, NY 11786
        *Attorney for Plaintiff Nalia Milien*

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
    By:   Thomas Gray
        *Attorney for Defendant Commissioner*
        *of Social Security*

JOHN GLEESON, United States District Judge:

        Nalia Milien seeks review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of the Commissioner of Social Security's denial of her application for a period of disability and disability insurance benefits. The parties have cross-moved for judgment on the pleadings. I heard oral argument on December 3, 2010. Because the Commissioner's decision is not supported by substantial evidence in the record, I deny the Commissioner's motion, grant Milien's motion, and remand for further proceedings.

BACKGROUND

On September 12, 2007, Milien filed an application for disability and disability insurance benefits, alleging that she had been disabled since June 27, 2007.[1] Her claim was denied on January 28, 2008. Milien requested and received a hearing before Administrative Law Judge ("ALJ") Manuel Cofresi, at which she appeared and testified on May 13, 2009. No medical or vocational expert testified at the hearing.

On July 31, 2009, ALJ Cofresi concluded that Milien was not disabled within the meaning of the Social Security Act on the ground that she retained the residual functional capacity to perform limited light work as defined in 20 C.F.R. § 416.967(b). The Appeals Council denied Milien's request for review on March 29, 2010, making the ALJ's adverse decision the final decision of the Commissioner. *See DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

A.  *The Plaintiff's Statements and Testimony*

Milien was born in 1957 and received an eighth grade education in her native Haiti. She immigrated to the United States in 1983. She worked in 1984 and 1985, and the following year she began working as a school bus escort, assisting disabled children in getting on and off school buses and carrying their school bags. Milien held that position from 1986 until the alleged onset of her disability in 2007. She lived independently prior to the onset date, but now lives with a cousin in Queens. Milien has six children, of whom five are adults; the sixth, a 14-year-old daughter, was sent to live with Milien's 25-year-old son in Atlanta when Milien's condition worsened. She is separated from her husband.

---

[1] Milien filed a previous application for benefits in 2006, which was denied on March 29, 2006. (R. 111.) She did not appeal that denial, and there is no indication that she stopped working prior to the alleged onset date in this case.

Milien suffers from HIV, hypertension, fatigue, obesity, and depression. Her HIV and hypertension are well-controlled by medication, but the medications' side effects have negatively impacted her health. She now regularly takes Atripla, amlodipine-benazepril, hydrochlorothiazide ("HCTZ"), Norvasc, and Sustiva. Her current symptoms arose shortly after a change in her HIV medication in the first half of 2007, which added Atripla to her daily regimen.[2] She ceased working shortly after the symptoms arose, because she was "too tired to work [and] too weak to continue working." (R. 114.)

In her testimony at the hearing before ALJ Cofresi, Milien complained that the medications prescribed by her doctor in early 2007 caused her to be "so sedated [at night] that if there were a fire she did not believe she would be able to wake up." (Milien Mem. at 3; R. 33.) She claims the medications also cause severe fatigue that persists for two to three hours after awakening each morning, and leaves her "sleepy" all day. (R. 33-34.) She noted at the hearing before ALJ Cofresi that she had skipped her medicine the night before in order to be sufficiently alert for the hearing. (R. 34.)

Milien is dizzy throughout the day, which prevents her from sitting more than 30-40 minutes at a time. (R. 29.) It also prevents her from taking the subway, because she feels it would be unsafe for her to exit at her destination in that condition. (R. 28.) Her dizziness began after the medication switch in early 2007. (R. 25.)

Milien testified that she is able to perform basic activities of personal maintenance, such as grooming, washing, and hairdressing. However, her dizziness and fatigue

---

[2] Common side effects of Atripla include dizziness and fatigue. Although these side effects dissipate within a few weeks in most patients, in some patients they are more long-term. *See Atripla*, http://www.atripla.com/atripla-isi.aspx ("Common side effects: Dizziness, headache, trouble sleeping, drowsiness, trouble concentrating, and/or unusual dreams. These side effects tend to go away after taking ATRIPLA for a few weeks. These symptoms may be more severe with the use of alcohol and/or mood-altering (street) drugs. If you are dizzy, have trouble concentrating, and/or are drowsy, avoid activities that may be dangerous, such as driving or operating machinery. . . . Other common side effects include: tiredness, upset stomach, vomiting, gas, and diarrhea.").

3

make her unable cook, clean, or shop. She can use public transportation, but is restricted to travel on the bus. (R. 27-28.) Her social activity is adequate, including weekly church attendance and meetings with family and friends.

B.   *Medical Evidence*

Milien has consistently been diagnosed with HIV, hypertension (poorly controlled), obesity, diabetes mellitus type 2, and depression. Other diagnoses throughout the relevant period have included fatigue (medically and virally induced), pterygia,[3] conjunctivitis, and microcytic anemia. She has also been treated for various opportunistic infections and other conditions apparently related to her HIV, including pneumonia, cryptococcus, neutropenia, thrombocytopenia, lymphocytosis, and hemoptysis.

Milien's medical record begins with an admission to Long Island Jewish Hospital on October 17, 2005, for treatment of hemoptysis. (R. 145.) At the time she was taking the prescription drugs Norvasc, Sustiva, Trivada, Lisinopril, and HCTZ. (*Id.*) An x-ray taken at the hospital revealed an opacity in the right lung "which may represent atelectasis,[4] confluence of shadows, loculated fluid or even a mass." (R. 156.)

On October 28, 2005, shortly after being released from the hospital, Milien was examined by her treating physician, Dr. Yvan Mardy.[5] Mardy had treated her on a monthly basis since February 12, 2001, and has continued to treat her through at least April 2009. (R. 157,

---

[3]   Pterygia refers to "an elevated, superficial, external ocular mass that usually forms over the perilimbal conjunctiva and extends onto the corneal surface. Pterygia can vary from small, atrophic quiescent lesions to large, aggressive, rapidly growing fibrovascular lesions that can distort the corneal topography, and, in advanced cases, they can obscure the optical center of the cornea." Jerome P. Fisher & William B. Trattler, *Pterygium* (Jan. 12, 2009), http://emedicine.medscape.com/article/1192527-overview.

[4]   Atelectasis is the collapse of all or part of the lung. *See* Michael R. Bye, *Atelectasis, Pulmonary* (Sept. 8, 2009) http://emedicine.medscape.com/article/1001160-overview.

[5]   The Commissioner apparently made three unsuccessful attempts to procure more records from Dr. Mardy. (Comm. Mem. at 20; R. 166-68.) While the Court commends the Commissioner's diligence, on remand the Commissioner should make a more vigorous attempt to procure these records, using the ALJ's subpoena power if necessary. Even if the renewed efforts are unsuccessful, the ALJ who conducts the hearing on remand is respectfully directed to detail what those efforts were, and their results.

232.) Mardy's primary diagnosis was hypertension, and he further diagnosed Milien as suffering from cryptococcosis, apparently based on the lung opacity. (R. 157.) He also diagnosed unspecified limitations resulting from Milien's conditions, including standing, walking, lifting, carrying, sitting, reaching, pushing, pulling, and driving. (R. 158.)

On February 9, 2006, Milien was evaluated by state agency psychologist Rochelle Sherman. Sherman noted that Milien had taken a leave of absence for health reasons in October and November 2005, and that though she had since returned to work, she was "having difficulty completing work tasks." (R. 159.) Milien displayed an unremarkable appearance, had "clear, fluent, and intelligible" speech with no evidence of thought disorder, a full range of affect, and a neutral mood. (R. 160.) Sherman also observed "mildly deficient" attention and concentration (*id.*), and "mildly impaired" memory (R. 161). Milien had below average cognitive functioning, but "good" insight and judgment. (*Id.*) She was independent in her living and able to follow directions, but had difficulty coping with stress. (*Id.*) Sherman concluded that her results "appear to be consistent with psychiatric and cognitive problems, which may interfere with the claimant's ability to function on a daily basis." (*Id.*) Milien was diagnosed with depression and given a guarded prognosis, though Sherman noted Milien would be able to manage her own funds. (R. 162.)

On the same date, Milien saw Dr. Steven Rocker, who appears to be a state agency physician.[6] Rocker indicated that Milien was generally healthy, with HIV and poorly controlled hypertension, a history of diabetes type two, and slight obesity. He determined that Milien was not limited in her hearing, speaking, sitting, handling, standing, walking, lifting, and carrying. (R. 165.)

---

6   The record contains only the second half of Dr. Rocker's medical report. (R. 164-65.) On remand, the Commissioner should make every effort to obtain the complete report.

Dr. Nisha Sethi, Milien's treating infectious disease specialist, filled out an undated disability questionnaire stating that she had last seen Milien on September 18, 2007, and that she had begun seeing her every two to three months on August 20, 2004.[7] (R. 182-93.) She noted that Milien's blood pressure was elevated, and that she had recently changed her medications. (R. 182.) She diagnosed Milien with AIDS [sic] and HTN (hypertension), noting that Milien had also displayed "behavior suggestive of a significant psychiatric disorder," namely, depression. (R. 183.) She described Milien's current symptoms as "dizziness, fatigue, depression -- v[ery] weak." (*Id.*) She noted that Milien's HIV antibody level was under 50, and that her T4 cell count was 909/1066. (R. 186.) Sethi determined that Milien had limitations with respect to standing and walking (up to six hours per day), lifting and carrying (10-20 pounds), and handling of objects due to both fatigue and weakness, but no limitations on her ability to sit, push, pull, travel, or understand. (R. 187, 191.) Milien's attitude, behavior, and appearance were depressed; her speech, thought, and perception slow; and her mood and affect very depressed. Her memory was lowered, but her attention and concentration were "ok" and her insight, judgment, and ability to perform calculations were "good." (R. 189.) Sethi noted that Milien was frequently depressed and would be unable to cope in a work setting. (R. 190.) She also noted that Milien was subject to dizziness lasting two to three hours. (R. 191.) There was no limitation in understanding, memory, concentration, persistence, social interaction, or adaption. (R. 192.) Sethi concluded with a notation that "Pt feels unable to work & cope up." (R. 193.)

On December 19, 2007, Dr. Scott Weinstein performed a consultative medical examination on Milien. He stated that Milien had reported a three-to-four year history of severe

---

[7] Dr. Sethi actually wrote that she began seeing Milien on August 20, 2007 (*see* R. 182), but the record makes clear that the correct year is 2004. (R. 116.)

fatigue "as a result of antiretroviral therapy." (R. 175.) The fatigue caused her to be "'very, very tired when [she awakes] in the morning and at night.'" (*Id.*) Milien also told Weinstein of "episodic lightheadedness" that appeared to be related to her blood pressure. (*Id.*) Weinstein recorded a largely normal physical workup, but noted "mild to moderate obesity" and "mild conjunctival hyperemia bilaterally" with "bilateral pterygia." (R. 177.) In addition to pterygia, he diagnosed fatigue, HIV, hypertension (poorly controlled), conjunctivitis, neutropenia, lymphocytosis, thrombocytopenia, and microcytic anemia, and declared Milien's prognosis "stable." (R. 178.)

On January 9, 2008, Milien's case was referred for a psychiatric consultation to Dr. Robert McClintock. Asked to comment on Milien's potential diagnosis of depression, he wrote "Clmt alledges [sic] Depression, which has to be developed as part of determining the claim." (R. 196.) He did not give any weight to Dr. Sethi's report, as Sethi was "not a Psychiatrist." (*Id.*) He recommended that "psych forms . . . be completed . . . and a psych CE [consultative examination] . . . be obtained." (*Id.*)

On January 15, 2008, Milien's case was referred for medical advice to Dr. P. Seitzman, who noted that "[t]here is no evidence secured of initial HIV diagnosis." He went on to state that there was currently "no evidence of HIV at all."[8] He concluded that there was "no basis for limiting RFC." (R. 198.)

On January 21, 2008, Milien received a psychiatric consultative evaluation by state agency psychologist Dr. Kenneth Cochrane. Cochrane observed that Milien's demeanor and responsiveness to questions was cooperative, but that her manner of relating, social skills,

---

8        Despite Dr. Seitzman's statement that there was no evidence of HIV, and the Commissioner's suggestion in his reply brief that Milien's HIV status is unproven (*see* Commissioner Rep. at 2), the ALJ listed HIV as one of Milien's severe impairments (R. 11.), a finding that the Commissioner's counsel confirmed at oral argument is not contested.

7

and overall presentation were "poor" due to her "inability to concentrate." (R. 201.) She was disheveled, poorly groomed, lethargic, and had poor eye contact. (*Id.*) Her affect was depressed and anxious, and her mood was dysthymic. (*Id.*) Her attention, concentration, and memory were impaired "due to limited intellectual functioning," and her insight and judgment were poor. (R. 202.) Although she was "able to follow and understand simple directions and instructions . . . [and] simple tasks," she was only minimally able to maintain attention and concentration. Cochrane noted that her "[c]urrent vocational difficulties are caused by medical problems and probable cognitive deficits." (*Id.*) He concluded that her prognosis was "guarded," and that her results appeared to be "consistent with cognitive problems [which] may significantly interfere with the claimant's ability to function on a daily basis." (*Id.*) He further concluded that Milien should seek further psychiatric treatment to rule out cognitive disorder and HIV-related dementia. (R. 203).

On January 25, 2008, Milien was evaluated by Dr. Wlodek Skranovski, a psychiatrist. Skranovski evaluated Milien under Listing 12.02 of the Listing of Impairments, 20 C.F.R. § 404 subpt. P. app. 1 (hereinafter "Listing"), which denotes the symptoms of organic mental disorders. (R. 212.) He indicated that "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria" set forth by Listing 12.02. (R. 213.) He determined that Milien had moderate difficulty in maintaining concentration, persistence or pace, but determined that there were no restrictions on her activities of daily living, no difficulties in maintaining social functioning, and no episodes of decompensation (collectively, the "B criteria"). (R. 222.) He determined that she met neither the B criteria nor the C criterion (a medically documented history of a disorder of at least two years' duration "that has caused more than a minimal limitation of ability to do any basic work activity"). (R. 223.)

In a more detailed form also completed on January 25, 2008, Dr. Skranovski concluded that Milien had no significant limitation in her ability to: remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; maintain a schedule; interact appropriately with the general public; ask questions; or adapt to a work environment. (R. 226-27.) She had moderate limitations on her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work closely with others without being distracted by them; complete a normal workday and workweek without interruptions from psychological symptoms or without having to take an "unreasonable number and length" of rest periods; and maintain socially appropriate behavior. (*Id.*) Skranovski found no evidence that she was limited in her ability to accept instructions, respond appropriately to criticism, or get along with coworkers or peers. (R. 227.)

On April 14, 2009, Dr. Mardy filled out a "treating doctor's patient functional assessment to do sedentary work." He opined that Milien could stand, walk, and sit less than four hours a day, and that she could lift less than five pounds for one-third of the day but less than three pounds for two-thirds of the day. (R. 232.) He stated that Milien required medications that interfered with her ability to function in the work setting, that she would have difficulty concentrating on her work, and that she would require more than two sick days per month. (R. 233.) He stated that she feels "'dizzy' when wake up in the AM secondary to medication taken at night." (*Id.*) He further noted that Milien was "clinically weak secondary to underlying disease and the various drugs taken ie HTN meds, etc." (*Id.*)

## DISCUSSION

A.  *The Standard of Review*

To be found eligible for disability benefits, Milien must show that, "by reason of any medically determined physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* § 423(d)(2)(A).[9] On review, the question presented is whether the Commissioner's decision to deny benefits is supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (*per curiam*). In deciding whether the Commissioner's conclusions are supported by substantial evidence, a reviewing court must "first satisfy [itself] that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purpose of the Act.'" *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).

The Social Security regulations direct a five-step analysis for evaluating disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in

---

9  Work may be substantial even if it is not full-time or if it generates less income or carries less responsibility than previous employment. 20 C.F.R. § 404.1572. Work is gainful "if it is the kind of work usually done for pay or profit, whether or not profit is realized." *Id.* Activities such as household tasks, hobbies, therapy, school attendance, club activities, or social programs are generally not considered to be substantial gainful activity. *Id.*

> Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

*DeChirico*, 134 F.3d at 1179-80 (2d Cir. 1998) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1520. The claimant bears the burden of proof in the first four steps, the Commissioner in the last. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

B.  *Analysis*

The ALJ followed the five-step procedure outlined above. He determined that Milien had not engaged in substantial gainful activity since June 27, 2007, her date of onset, and that she would continue to meet the insured status requirements of the Social Security Act through December 31, 2011. (R. 10.) He determined that she had several "severe impairments:" HIV, high blood pressure (hypertension), fatigue, obesity, and depressive disorder. (*Id.*) He evaluated her HIV under Sections 14.00D and 14.08D of the Listing, her hypertension under Section 4.00 of the Listing, and her mental impairment under Listing 12.04,[10] and found that these conditions did not meet the criteria for such disorders under either 20 C.F.R. § 404.1525 or 20 C.F.R. § 404.1526. (R. 11.) He noted that obesity is "one of multiple factors" under the musculoskeletal listings, but is no longer considered to be a separate impairment. He thus found that "the claimant's obesity exacerbates her fatigue but [not] to the point where any of these

---
[10] Because the ALJ's treatment of Milien's HIV status and related symptoms are sufficient to require a remand, I do not undertake to resolve the differences between Milien and the Government regarding her psychological impairment. On remand, the Commissioner should seek to further develop the record with regard to Dr. Cochrane's rule-out order (HIV-related dementia) (R. 203), and should properly evaluate the entire record with in order to correctly determine whether Milien is subject to any of the Criteria B limitations, *see infra* Parts B.1 and B.2.b.

impairments meets or equals a listing either singly or in combination." (*Id.*) He did not separately consider her fatigue under the Listing.

The ALJ next determined that Milien retained the residual functional capacity to perform her past relevant work. (*Id.*) Although he was not required to proceed to the fifth step, having answered the fourth question in the affirmative, he did so "assuming, arguendo, that the claimant was unable to perform her past relevant work." (R. 16.) At the fifth step, the ALJ concluded that Milien was not disabled under the Social Security Act because she retained the residual functional capacity to perform the statutory range of "light work," with a restriction to "simple rote tasks" only. (R. 12.) *See* 20 C.F.R. § 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.").

1.  *The ALJ failed to properly apply the HIV listing*

An ALJ faced with an HIV-related disability must evaluate the claimant's allegations under Listings 14.00 (immune system disorders) and 14.08 (HIV infection). Listing 14.08 contains an extensive list of HIV symptoms and HIV-related conditions, each of which, if found, would call for a finding of disability. Among those symptoms and conditions, a claimant's HIV status meets the listing where the claimant has suffered "[r]epeated . . . manifestations of HIV infection . . . resulting in significant, documented symptoms or signs (for example, severe fatigue . . .), and one of the following at the marked level: 1. Limitations of activities of daily living. 2. Limitation in maintaining social functioning. 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." Listing 14.08K. Listing 14.00, which provides general instructions regarding the ALJ's

evaluation of a claimant's HIV symptoms, states that the side effects of HIV medication are to be given the same weight as effects of the disease itself. *Id.* § 14.00G(5)(a) ("The symptoms of HIV infection and the side effects of medication may be indistinguishable from each other. We will consider all of your functional limitations, whether they result from your symptoms or signs of HIV infection or the side effects of your treatment.").

ALJ Cofresi's conclusion that "[t]he record does not show that the claimant's HIV positive status has advanced to the point of causing secondary medical complications" (R. 11), disregarded what the ALJ had already termed a "severe impairment" -- Milien's fatigue. Even if the fatigue was related to Milien's medications (a finding ALJ Cofresi did not make),[11] it should have been given equal weight with all of Milien's other HIV-related symptoms. Such a side effect is explicitly contemplated by Listing 14.00. *Id.* § 14.08G(5)(a) ("Side effects of antiretroviral drugs include, but are not limited to: . . . severe fatigue. . . ."). Elsewhere in Appendix 1, dizziness is classified as a side effect of medication that "compromise[s] the individual's ability to function." *See, e.g.*, *id.* § 1.00I(2). As Milien stated in her testimony, her dizziness is at least in part the result of her HIV medications, and it prohibits her from maintaining even sedentary employment. (R. 32; *see* R. 233 (Mardy report).) By disregarding Milien's severe fatigue and dizziness, ALJ Cofresi failed to properly apply Listing 14.08K.

Moreover, ALJ Cofresi did not properly evaluate the three areas of functional impairment laid out in Listing 14.08K: activities of daily living, social functioning, and completing tasks. Milien's condition meets at least one appropriate listing: Listing 14.00I states that the Commissioner "will find that you have a marked limitation of activities of daily living if

---

[11] An attribution of Milien's symptoms, in whole or in part, to her medication may in fact be a misstatement of the record. As Milien points out in her papers, Dr. Cochrane recommended a rule-out examination for HIV-related dementia that might have been an alternative cause of her cognitive and fatigue-related symptoms. (Milien Mem. at 11; *see* R. 203.) Although it appears such a rule-out was never performed, the ALJ could not, on the record available, have concluded that Milien's cognitive and fatigue-related symptoms were not signs of "secondary medical complications" of her HIV.

you have a serious limitation in your ability to maintain a household or take public transportation because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, caused by your immune system disorder (including manifestations of the disorder) *or its treatment*, even if you are able to perform some self-care activities."). Listing 14.00I(6) (quotation marks omitted and emphasis added). Milien testified that she is unable to take the subway and was restricted to buses (R. 28); that she is no longer able to maintain her independent household or properly care for her minor child (R. 27, 34-35); and that she cannot cook, clean, or shop (R. 27). Dr. Cochrane stated that due to her cognitive deficits, Milien would not be able to manage her own money and pay her own bills. (*See* R. 202, Listing 14.00I(6) ("Activities of daily living include . . . paying bills."); *see also infra* Part B.2.b.) The ALJ did not take into account this testimony, and thus failed to consider the substantial weight of the evidence with regard to Milien's functional limitations. The ALJ's failure to properly evaluate Milien's HIV status according to Listings 14.00 and 14.08 requires a remand.

2. *The Failure to Observe the Treating Physician Rule*

Under the regulations, a treating physician's opinion about a claimant's impairments is entitled to "controlling weight" if it is "well [] supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations). The Commissioner must set forth "good reasons" for refusing to accord the opinions of a treating physician controlling weight. He must also give "good reasons" for the weight actually given to those opinions if they are not considered controlling. 20 C.F.R. § 404.1527(d)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue

remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician."). When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by reference to: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. § 416.927(d)(2)).

ALJ Cofresi's failure to state the amount of weight he assigned to Dr. Mardy's opinion was erroneous. If he chose not to accept Mardy's observations as controlling, he should have undertaken the analysis required by *Schaal* in order to determine the weight Mardy's opinions would be given -- including, for example, a discussion of the frequency with which Mardy treated Milien. Instead, ALJ Cofresi stated that he gave "no controlling weight to the medical source statement set forth by treating physician [Mardy because he] finds limits that far exceed the evidence of record. This opinion is based on the claimant's subjective complaints. There is no objective clinical or laboratory diagnostic findings that support this functional assessment." (*Id.*) Because the ALJ failed to conduct a proper *Schaal* analysis, thus applying an incorrect standard to Mardy's potentially dispositive report, the case must be remanded. *See Schaal*, 134 F.3d at 503 ("Because it is not entirely clear what legal standard the ALJ applied, and because we find that the ALJ . . . failed to follow SSA regulations requiring a statement of

valid reasons for not crediting the opinion of plaintiff's treating physicians, we conclude that a remand is necessary in order to allow the ALJ to reweigh the evidence.").

3.  *The Defective Adverse Credibility Finding*

In resolving whether a plaintiff is disabled, the Commissioner must consider subjective evidence of pain or disability testified to by the claimant.[12] The ALJ has discretion to evaluate a plaintiff's credibility, and "[i]f the ALJ's decision to ignore plaintiff's subjective complaints of pain is supported by substantial evidence, then this Court must uphold that determination." *Aronis v. Barnhart*, No. 02-CV-7660, 2003 WL 22953167, at *7 (S.D.N.Y. Dec. 15, 2003). However, the ALJ must set forth his reasons for discounting a plaintiff's subjective complaints with "sufficient specificity to enable [the district court] to decide whether the determination is supported by substantial evidence." *Miller v. Barnhart*, No. 02-CV-2777, 2003 WL 749374, at *7 (S.D.N.Y. Mar. 4, 2003). An ALJ's credibility finding is "not supported by substantial evidence and is the product of legal error" where the reasons set forth by the ALJ as explanation for an adverse credibility determination are "based in part on testimony that [the claimant] did not give and an inconsistency that did not exist." *Horan v. Astrue*, 350 Fed. App'x 483, 484 (2d Cir. 2009).

Because the ALJ concluded that the objective medical evidence could reasonably give rise to Milien's symptoms, a dispositive reason for the ALJ's denial of benefits was his opinion that Milien's testimony about the extreme nature and limiting effects of her dizziness and fatigue was not credible. (R. 14, 22.) As explained below, I conclude that his adverse

---

12  *See Davis v. Massanari*, No. 00-CV-4330, 2001 WL 1524495, at *6 (S.D.N.Y. Nov. 29, 2001) ("Statements about a claimant's pain cannot alone establish disability; there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged."). The medically determinable impairments that produce Milien's disability are well documented in the physicians' reports she submitted.

credibility determination is not supported by substantial evidence on the record, and thus requires a reversal.

The reasons for ALJ Cofresi's adverse credibility determination were threefold. First, he stated that Milien "has had very limited medical evaluation and treatment for her complaints of pain and depression." (R. 15.) Second, the ALJ observed that "despite [Milien's] allegations suffering from physical and mental impairments, throughout the period of time in issue she has continued to live independently and take care of all her personal needs, own household chores, shopping and cooking. Moreover she continues to socialize." (*Id.*) Finally, he found that Milien's statements were not "consistent with the medical evidence of record or that her allegations of pain and depression [were] not supported by the record." (*Id.*)

With regard to Milien's depression, the ALJ's negative inference from her lack of treatment was improper. The record reflects that her depression did not arise until "a few months" before she met with Dr. Sethi in the Fall of 2007 -- in other words, very close in time to her alleged onset date, when she stopped working and presumably lost her insurance. (R. 183.) At her hearing, Milien testified that she no longer had medical insurance and had stopped seeing doctors because she could not pay.[13] (R. 30.) The Social Security regulations specifically state that "when we assess the credibility of your complaints about your symptoms and their functional effects, we will not draw any inferences from the fact that you do not receive

---

13   Although Milien did not allege that her failure to seek psychological treatment was due to her financial status, it was not proper for the ALJ to draw an inference against her given that, moments prior to being asked about her psychological treatment, she had stated that she could no longer visit her infectious disease specialist due to her lack of insurance. An ALJ conducting an administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits. *See* 20 C.F.R. § 416.1400(b) (expressly providing that the Social Security Administration "conduct the administrative review process in an informal, nonadversary manner"); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits...."); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). As a matter of complying with this mandate and in all fairness, if the ALJ was concerned about Milien's reasons for not seeking psychological treatment, he should have asked her about them. Perhaps, upon hearing the answer, he might not have concluded that she was testifying falsely about her pain and depression.

treatment or that you are not following treatment without considering all of the relevant evidence in your case record, including any explanations you provide that may explain why you are not receiving or following treatment." Listing 14.00H. Milien has provided a reasonable financial explanation for her failure to seek medical attention in general. Where there is an explanation for the lack of treatment, coupled with evidence from several state agency psychologists indicating a psychiatric impairment and the ALJ's own classification of Milien's "depressive disorder" as "severe," the ALJ's adverse credibility determination drawn from Milien's minimal psychological treatment is improper.

Second, the record is clear that Milien neither "continued to live independently" nor could she "take care of all her personal needs, own household chores, shopping and cooking." (R. 15.) To the contrary, the testimony reflects that she had substantial limitations in her independence and in the activities of daily life:

> Q: Now, how are you managing now? Who do you live with?
>
> A: I'm living with my cousin. . . .
>
> Q: And how do you manage with things . . . like shopping and cooking, cleaning?
>
> A: I don't do that. I can't.
>
> Q: How about . . . taking care of personal care needs, dressing and bathing[?] . . .
>
> A: Yes. I, I try, but it took me, it took me time.

(R. 27.) Milien also testified that she had no money at all and was frequently dependent on her cousin for transportation. (R. 28.) As in *Horan*, the ALJ's adverse credibility determination was based at least in part on testimony Milien did not give. *See Horan*, 350 Fed. App'x at 484. ALJ Cofresi's misapprehension of Milien's testimony on the subject of daily living, and thus his

erroneous determination of her credibility with regard to the severity of her symptoms, requires a remand.[14]

Finally, the ALJ failed to properly consider Milien's 24-year work history. "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983); *see Horan*, 350 Fed. App'x at 485 (reversing and remanding in part because "the ALJ committed legal error in failing to consider [the claimant's] work history"). Milien had an extensive track record of consistent employment, 22 years of which were at the same company. Further, she testified that she left her job only when "they changed my medication" (R. 25), at which point she "[could not] get up to go into work" because she felt "dizzy . . . and [her] heart ke[pt] beating so fast."[15] (R. 26.) Milien's testimony strongly suggests that she left her long-standing place of employment only when her symptoms took a dramatic turn for the worse. ALJ Cofresi did not accord "substantial credibility" to Milien based on her long work history, and failed to mention her work history in the context of his credibility determination.[16] (*See* R. 8-17.) On remand the Commissioner need not necessarily find this work history dispositive on the issue of Milien's credibility, but he must not ignore its existence.

---

14   The ALJ also erred by apparently considering as evidence that Milien was not disabled her two 18-hour bus trips to Georgia to visit her 14-year-old daughter -- the daughter she had sent to live with another family member because Milien could no longer care for her. As Milien notes in her reply filing, she testified that her medications caused her to sleep through the entire bus ride. This is far from a contradiction of her other statements regarding her disability. (R. 14, 36-37; Milien Rep. at 5.)

15   By 2007 Milien had a three- to four-year history of severe fatigue. (R. 175.) Her ability to work through this severe impairment, leaving her job only when her medications further disrupted her ability to work in 2007, should have been seen by the ALJ as further evidence of her credibility.

16   The Commissioner argues that the ALJ did take Milien's work history into account by stating that she worked for "at least 21 years." (Commissioner Rep. at 4). But that was not stated in the context of a credibility determination, but in the ALJ's statement of facts. (R. 13.) There is no evidence in the record that ALJ Cofresi considered Milien's work history when he drew an adverse credibility determination. The rule in *Rivera* requires the ALJ to apply a good work record toward the claimant's credibility, not merely mention the work history somewhere in his or her decision. *See Wilber v. Astrue*, 2008 WL 850327, at *3 & n.3, No. 07-CV-57S (W.D.N.Y. Mar. 28, 2008) (where ALJ mentioned work history as fact but gave it no weight in credibility determination, ALJ did not follow *Rivera* rule).

## CONCLUSION

The Commissioner's motion for judgment on the pleadings is denied, Milien's is granted, and the case is remanded to the Commission for further proceedings.

So ordered.

John Gleeson, U.S.D.J.

Dated: December 16, 2010
       Brooklyn, New York